## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **HECTOR VASQUEZ ESCALANTE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **REPORT AND RECOMMENDATION** |
| | ) | **Civil Action No. 7:10cv00211** |
| | ) | |
| **LARRY W. HUFFMAN,** *et al.*, | ) | **By: Hon. Pamela Meade Sargent** |
| **Defendants.** | ) | **United States Magistrate Judge** |

Hector Vasquez Escalante, a Virginia inmate proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants, in their official and individual capacities, Larry Huffman, a former Virginia Department of Corrections, ("VDOC"), Regional Director; Bryan B. Watson, Warden of Wallens Ridge State Prison ("WRSP"); A.P. Harvey, a former Assistant Warden of WRSP; and P. Scarberry, Food Operations Director for WRSP. Plaintiff alleges that the defendants were deliberately indifferent to a basic human need, in violation of the Eighth Amendment, by not providing him with adequately nutritious substitutes for foods containing wheat. The defendants filed a Motion For Summary Judgment, (Docket Item No. 26) ("Motion"), and plaintiff responded, making the matter ripe for review. The Motion is before the undersigned magistrate judge by referral pursuant to 20 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

*A.    Plaintiff's allegations and defendants' responses*

Plaintiff must receive a medically prescribed wheat-/gluten-free diet because of his allergy to wheat, which is commonly known as "Celiac's disease." (Amended Complaint, (Docket Item No. 11), ("Am. Compl."), at ¶ 6, ¶ 8.) Plaintiff acknowledges that he is not being altogether denied food at WRSP or that a no-wheat diet was not approved. (Am. Compl. at ¶ 24.) Instead, plaintiff alleges that WRSP "kitchen personnel have not made available for plaintiff to receive well balanced meals that contain sufficient nutritional value to preserve his health." (Am. Compl. at ¶ 9.) Notably, plaintiff states that he lost 34 pounds over 13 months and becomes dizzy when he tries to exercise as a result of the poor nutrition from WRSP's food.[1] (Am. Compl. at ¶ 22, Attch. 15-18 to Complaint, (Docket Item No. 1); Affidavit attached to Plaintiff's Response to Defendants' Motion For Summary Judgment, (Docket Item No. 46-1), ("Escalante Affidavit"), at ¶ 4.) Plaintiff arrived at WRSP on December 27, 2007.

Plaintiff included with his Complaint a letter from a registered dietician with the Virginia Department of Health, ("VDOH"), that describes Celiac's disease and treatment options. The dietician acknowledges that people who cannot tolerate gluten "can eat a well-balanced diet with a variety of foods. . . . [like] corn, potato[es], rice, soybeans, tapioca, arrowroot, carob, buckwheat, millet, amaranth, and quinoa. 'Plain'

---

[1] To support this allegation, plaintiff attached a copy of his inmate medical record and an information request. These documents show that plaintiff, who is about 5 feet and 4 inches tall, weighed 177 pounds when he arrived at the WRSP in December 2007, 166 pounds in March 2008, 155 pounds in May 2008, and 143 pounds in December 2008.

meat, fish, rice, fruits, and vegetables do not contain gluten, so people who cannot tolerate gluten can freely eat these foods." (Attch. 14 to Complaint, ("Letter"), at 1.) The dietician attached documents from the United States Department of Health and Human Services, ("DHHS"), describing other acceptable nonwheat foods: cassava, flax, Indian rice grass, Job's tears, nuts, sago, seeds, sorghum, wild rice and yucca. (Letter at 3.) The dietician included a sample menu for a gluten-free meal that includes milk, lean hamburger, gluten-free breads, fruit salad, pure mayonnaise, yogurt, rice cakes, green salads, baked chicken breast, steamed spinach and rice pudding. (Letter at 2.)

The VDOC offers three primary menus for inmates: the master menu, the medical menu and the common fare menu. All medical menus are modifications of the master menu and all medical diets are authorized in the Food Service Manual. (Ex. I to Memorandum In Support Of Motion For Summary Judgment, (Docket Item No. 27), ("Shear Affidavit"), at ¶ 4.) Because of plaintiff's wheat allergy, food items on the master menu are altered to be consistent with a prescribed wheat-free diet. Rice is a nutritionally equivalent replacement for carbohydrate-based foods such as breads, biscuits, rolls and pastas. Fruit is a nutritionally equivalent replacement for flour-based, carbohydrate desserts. Protein also has to be managed because many meat entreés contain wheat either as breading or a binder. For breakfast, peanut butter or eggs are a nutritionally equivalent protein replacement for sausage, French toast and pancakes, which contain wheat. For lunch and dinner, beans are a nutritionally equivalent replacement of protein for a meat entrée containing wheat.

Per policy, all wheat items on the master menu may be substituted with wheat-/gluten-free items if a wheat-allergic inmate identifies himself at the tray window.[2] (Shear Aff. at ¶ 5.) These substitutions include hamburgers, hotdogs, lunchmeat, nonbreaded fish and potatoes when available and on the menu; rice as a substitute for bread, biscuits and rolls; fruit as a substitute for flour-based desserts such as cookies or cake; prior to March 2009, cheese or peanut butter as a substitute for pancakes, French toast and waffles; since March 2009, rice or eggs as a substitute for pancakes, French toast and waffles; oatmeal or grits as a substitute for farina; cheese or peanut butter as a substitute for breakfast meats that contain wheat; beans as a substitute for lunch and dinner meats that are breaded or contain wheat; and rice as a substitute for pasta items. (Scarberry Affidavit at ¶ 5.)

However, plaintiff complains that, during the eight months before filing the Complaint, he mostly received for breakfast white rice, which he believes has no nutritional value, instead of the cheese or peanut butter he often previously received as wheat substitutes for breakfasts. (Am. Compl. at ¶ 11.) Plaintiff also complains that he receives only white rice, beans and potatoes as wheat substitutes for lunch and dinner wheat items instead of the beans, cheese and potatoes he previously received as substitutes for lunch and dinner wheat items. (Am. Compl. at ¶ 12.) He alleges that the rice hardly ever is fresh because the general population receives fresh rice only once or twice per week, but he receives old, stale, rubber-like, and thus inedible, rice in the

_____

[2] Scarberry alleges that plaintiff on numerous occasions either took a regular tray or did not identify himself so that he could be served a wheat-free/gluten-free tray. (Encl. A to Ex. II to Docket Item No. 27, ("Scarberry Affidavit"), at ¶ 6). Plaintiff acknowledges that he has taken regular trays on several occasions because he could not eat the same items again from his nonwheat trays. (Docket Item No. 46 at 12 n.1). Instead, plaintiff eats the foods he can from the regular tray and either sells or trades the foods he cannot eat for more of the food he can eat.

days between the fresh rice servings. (Escalante Affidavit at ¶ 2.) Plaintiff becomes sick when he eats the excessive amounts of beans he receives at least five days a week. (Escalante Affidavit at ¶ 3.) Plaintiff alleges he experiences indigestion, diarrhea, upset stomach, constipation, bloating, vomiting and nausea from the food he eats. (Am. Compl. at ¶ 17.) To supplement his diet with additional calories, plaintiff purchased over $2,000 worth of food from the commissary. (Am. Compl. at ¶ 9.)

To support his claims, Escalante offers the affidavits of three inmates: a cellmate, a former kitchen worker and an inmate who passed out food trays ("pod feeder"). Escalante's cellmate avers that plaintiff receives freshly cooked rice once or twice a week, but the rice is old, dry and stale at other times. (Attch. 1 to Docket Item No. 46, ("Aguilar Affidavit"), at ¶ 3.) He further explains that, while the beans mostly appear fresh, they cause plaintiff diarrhea and cramping. (Aguilar Affidavit at ¶ 4.) The former kitchen worker avers that he used to prepare plaintiff's tray, the rice plaintiff received was not freshly cooked each day, and the only time plaintiff received fresh rice was when the general population received fresh rice. (Attch. 1 to Docket Item No. 46, ("McCallum Affidavit"), at ¶¶ 1-2.) Between those times when the rice was freshly cooked, which was once or twice a week, plaintiff received leftover rice. (McCallum Affidavit at ¶ 3.) The pod feeder saw plaintiff's trays and avers that rice and beans were the wheat substitutes for most of plaintiff's lunch and dinner trays, even if something was on the regular menu that plaintiff could eat. (Attch. 1 to Docket Item No. 46, ("Alvarez Affidavit"), at ¶ 4.) Escalante mostly received rice, potatoes and grits for breakfast. (Alvarez Affidavit at ¶ 5.)

Escalante feels punished because he does not receive the same variety of foods

as other prisoners but has eaten the same few items every day for more than two years. Escalante avers that he has not received peanut butter for about two years and rarely receives eggs unless they are on the main menu. (Docket Item No. 46 at 11.) Escalante wants to receive the same meals as other inmates but without any added wheat ingredients, like wheat-based breading and meat fillers. (Am. Compl. at ¶ 24.)

In his supplemental brief, Escalante reiterates statements made in the Amended Complaint. Escalante further alleges, however, the he does not receive sufficient protein in his morning meals, although he acknowledges that he receives eggs when other inmates receive eggs for breakfast. Escalante also states he saw the facility doctor about his inability to eat beans, but the doctor ultimately decided not to order "bean intolerance" blood tests. Escalante cites in support of his stale rice argument a response to one of his grievances from WRSP food service staff. The staffer told Escalate that "all leftovers are kept a week in the cool[]er and if they are not used in that time they are discarded and are reheated only once[,] th[e]n they are discarded." (Ex. H to Supplemental Brief, (Docket Item No. 49.))

Escalante requests as relief a declaratory judgment to recognize that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and an injunction to compel the defendants to serve him a nutritious and varied no-wheat diet. Escalante also requests compensatory and punitive damages.

B.    *The administrative record*

On February 12, 2008, Escalante submitted a regular grievance, alleging that the medical department recognized his wheat allergy and that food service was aware of it.

Escalante stated that he had not been denied a nonwheat tray but was not receiving the proper nutritional meals in place of items that contained wheat. He complained that he was being served only beans and peanut butter as alternatives. Escalante further alleged that that he had to rely on commissary purchases to survive. (Attch. 3 to Compl.).

On February 25, 2008, Warden Watson issued a Level I response to Escalante's regular grievance. Watson informed Escalante that his allegations had been investigated and that the nurse reported that WRSP medical staff had not received the results of his wheat-allergy test. Watson also informed Escalante that a Food Service manager reported that staff was preparing his trays as if his allergy test was positive. Watson found no evidence to support Escalante's allegations regarding improper portions and not receiving meals according to policy. Watson further informed Escalante that he needed to inform the floor officer if there was a problem with his food tray. Watson lastly informed Escalante that VDOC policy provides for menus that ensure inmates receive meals that are nutritionally adequate while accommodating therapeutic diets for offenders whose medical condition necessitates alterations from the master menu. Watson determined Escalante's grievance unfounded. (Attch. 4 to Compl.).

Escalante appealed Watson's Level I decision to Regional Director Larry Huffman. In his appeal, Escalante alleged that he had witnesses who could prove he had a food allergy and that he was not receiving the proper meals. Regional Director Huffman informed him that the matter had been investigated, and it was determined that WRSP staff was aware of his allergy and had been serving him meals that do not

contain wheat and that staff was administering the appropriate substitutions according to policy. Huffman upheld Watson's Level I review. (Attch. 5 to Compl.).

Scarberry received Escalante's Request for Information on April 2, 2008. In this request, Escalante stated that he was concerned that he was not receiving the proper substitutes for bread and wheat products. He stated that most of the substitutes consist of grits, potatoes and beans. Escalante stated he would rather have double portions of meat instead of so many beans. Scarberry explained that he cannot receive double portions of meat as a substitute and that beans, cheese or peanut butter, depending on the appropriate meal, is the substitute for a wheat-based entrée. (Scarberry Affidavit at ¶ 7.)

On April 14, 2008, Escalante submitted another Request for Information, stating that he had been prescribed a medical diet that excluded wheat products and did not receive balanced, nutritional meals by being served grits, cheese and potatoes as substitutes for wheat products. Escalante alleged that he had lost weight, had constant constipation as a result and had missed meals. Harvey responded to Escalante's request, suggesting that he contact a nurse about his medical diet.[3] Harvey expressed confidence that food service staff would follow any diet prescribed by the medical department. (Encl. A to Ex. IV to Docket Item No. 27, ("Harvey Affidavit"), at ¶ 5.)

On April 15, 2009, Escalante submitted a Request for Information, stating that

---

[3]As the Assistant Warden, Harvey was responsible for assisting the Warden with the day-to-day functions within WRSP and responding to Level I inmate grievances. However, Harvey avers that he had no role in creating or planning offenders' meals, regardless of whether they were regular or medically prescribed. (Harvey Aff. ¶ 4.)

he did not believe the kitchen staff knew how to feed him due to his wheat allergy because they gave him the same foods every day. He suggested a meeting with administrative and food service staff to discuss a menu plan that would work for him that would not depart from the menu. Harvey responded, explaining that he was aware this had been an ongoing concern for Escalante, he had spoken to the food service department, and they were aware of his concerns. (Harvey Affidavit at ¶ 6; Encl. B to Harvey Affidavit.)

On April 25, 2009, Escalante submitted another Request for Information, recognizing that Harvey denied his meeting request to discuss an alternative meal plan. Escalante requested Scarberry give him a copy of what he was supposed to be receiving at every meal so he would know what he is supposed to be eat. Harvey informed him that he could contact Scarberry with his request. (Harvey Affidavit at ¶ 7; Encl. C to Harvey Affidavit.)

On May 17, 2009, Escalante submitted a new Request for Information, stating that he had made a request to Food Service to give him a list of what he was supposed to eat, but that Food Service had not responded to any of his requests. Harvey instructed him to get in contact with his counselor to receive a copy of the menu. (Harvey Affidavit at ¶ 8; Encl. D to Harvey Affidavit.)

On June 4, 2009, Escalante submitted a follow-up Request for Information, stating that he did not want a copy of the regular menu, but wanted a copy of the menu he was supposed to receive because he did not believe that the meals he received had sufficient nutritional value to replace the wheat products he could not consume.

Harvey informed him that anyone could make a request for a copy of the menu through a counselor as long as the requestor paid for it. (Harvey Affidavit at ¶ 9; Encl. E to Harvey Affidavit.)

On December 30, 2009, Escalante submitted a new Request for Information about his diet. Watson informed Escalante that he and other staff had responded to Escalante about his diet on several occasions. Watson reiterated that Food Service was not giving Escalante improper foods in exchange for nonwheat products and that he was attempting to get specific food items of his own choice instead of what was available. Watson informed Escalante that offenders are not allowed to choose their own foods, but must receive what is available. Watson believed the substitutions were appropriate even if Escalante may not like them. (Attch. III to Docket Item No. 27, ("Ravizee Affidavit"), at ¶ 9; Encl. C to Ravizee Affidavit.)

## II.

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party, a reasonable fact-finder could return a verdict for the nonmovant. *See Anderson*, 477 U.S. at 248. The moving party has the burden of "pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the nonmovant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the nonmovant. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the nonmoving party. *See Anderson*, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment also is not appropriate where the ultimate factual conclusions to be drawn are in dispute. *See Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). A court may neither resolve disputed facts nor weigh the evidence, *see Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, *see Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary

judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

A. *The statute of limitations bars claims accruing before May 18, 2008*

Section 1983 adopts the statute of limitations that the forum state uses for general personal injury cases. *See Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Virginia's statute of limitations applicable to § 1983 actions is two years. *See* VA. CODE ANN. § 8.01-243(A) (2007 Repl. Vol. & 2011 Supp.). However, federal law itself governs the question of when a cause of action accrues. *See Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975). A federal cause of action accrues when "the plaintiff has 'a complete and present cause of action'" when the plaintiff "can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.,* 522 U.S. 192, 201 (1997); (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)); *see Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (holding that a cause of action under § 1983 accrues and the statute of limitations begins running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action").

Escalante acknowledges that he discovered the "current situation for which he complains . . . upon his arrival at the [WRSP] on December 27, 2007." (Docket Item No. 46 at 9.) However, he did not file the instant action until no earlier than May 18, 2010. *See Houston v. Lack*, 487 U.S. 266 (1988) (describing prison-mailbox rule). Therefore, Escalante's cause of action accrued more than two years before he filed the

instant action, and the events that occurred prior to May 18, 2008, are time-barred unless the court tolls the limitations period.

### 1.    Plaintiff's "motion for delayed" does not toll the statute of limitations

Escalante argues that the court should consider his claims timely because the court granted his "Motion For Delayed." (Docket Item No. 5.) In that motion, Escalante requested the court "grant him this motion for delayed and accepts and files his [enclosed] Civil Action." (Docket Item No. 5 at 2.) The court granted his Motion For Delayed "to the extent the court accepted his complaint and filed it on the active docket of the court." (Docket Item No. 29.) Accordingly, the court granted the motion to allow the action to be filed on the active docket, but not as means to toll the statute of limitations.

### 2.  Virginia law does not relieve plaintiff from the statute of limitations

Escalante also explained in his Motion For Delayed that the institution's law library provided outdated, erroneous information that the applicable statute of limitations was three years. Thus, Escalante concludes, the defendants should not benefit from providing erroneous information via the WRSP law library. However, this argument does not provide a basis to toll the statute of limitations.

Virginia law allows for tolling the statute of limitations when a defendant uses "direct or indirect means to obstruct the filing of an action . . . ." VA. CODE ANN. § 8.01-229(D) (2007 Repl. Vol.); *see Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th

-13-

Cir. 1999) (holding Virginia's rules regarding equitable tolling apply when Virginia's statute of limitations applies). "Obstruction" occurs when a defendant engages in fraudulent behavior involving moral turpitude to conceal a cause of action. *See Horn v. Abernathy*, 343 S.E.2d 318, 321 (Va. 1986) (stating a constructive fraud is insufficient to toll the statute of limitations). Escalante does not qualify for tolling under this statute because he has not established a relationship between any of the specific defendants and the law library's alleged misinformation. Furthermore, the alleged misinformation about the statute of limitations did not conceal a cause of action. Moreover, Escalante also fails to establish a person's actual fraudulent intent by some trick or artifice. Therefore, the court concludes that Escalante is not eligible for equitable tolling under Virginia's statute. *See Burns v. Bd. of Supervisors*, 315 S.E.2d 856, 859 (Va. 1984) ("In light of the policy that surrounds statutes of limitation, the bar of such statutes should not be lifted unless the legislature makes unmistakably clear that such is to occur in a given case. Where there exists any doubt, it should be resolved in favor of the operation of the statute of limitations.").

### 3. Plaintiff's cause of action did not accrue from the date of the last injury

Escalante argues that the court should toll the statute of limitations because his alleged injury was continuous throughout the time he has been incarcerated at WRSP. Under his argument, his Eighth Amendment claim would not accrue until he experiences the last injury or until the last alleged violation occurs. Thus, Escalante believes the claims are timely filed because he consistently lost weight for many months after he arrived at WRSP and continues to receive inadequate nutrition.

However, Escalante did not need to experience the full extent of his weight loss in order to file the instant action. *See Corcoran v. N. Y. Power Auth.*, 202 F.3d 530, 544 (2d Cir. 1999) (stating in order for claim to accrue, plaintiff "need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim" (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)); *Mendez v. United States*, 655 F. Supp. 701, 705 (S.D.N.Y. 1987) ("To be aware of an injury, plaintiff need not know the full extent of his or her injury. The statute will run even though the ultimate damage is unknown or unpredictable") (internal quotation marks and citations omitted). *See also Wallace v. Kato*, 549 U.S. 384, 391 (2007) (rejecting view that the statute of limitations would begin to run only after a plaintiff became satisfied that he had been harmed enough); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (holding, in the context of employment discrimination, that "discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). Escalante admits he knew of the inadequate nutrition upon his arrival in December 2007 and, according to his medical record, lost 11 pounds in the first three months at WRSP. Accordingly, Escalante experienced a basis for his cause of action more than two years before he filed this action in May 2010, and the cause of action does not continually accrue based on subsequent injuries.

### 4.     Plaintiff is not entitled to equitable tolling of the statute of limitations

Equitable tolling of the statute of limitations is not appropriate where the claimant has failed to exercise due diligence in preserving his legal rights, and that relief is appropriate only for the most deserving complainant. *See Chao v. Va. Dep't of*

*Transp.*, 291 F.3d 276, 283 (4th Cir. 2002) (limiting grounds for equitable relief from limitations periods to "situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass . . . [or] when extraordinary circumstances beyond plaintiff's control made it impossible to file the claims on time."). Escalante does not explain how he discovered the two-year statute of limitations despite the allegedly erroneous information in the law library. Furthermore, Escalante's strategic decision to wait to file his Complaint until near the end of the statute of limitations period as he believed it to be, despite knowing of his claim by December 2007, does not support diligence in pursuing his claim. Accordingly, the court declines to equitably toll the statute of limitations, and Escalante's claims that accrued before May 18, 2008, are time-barred.[4]

**B.      *Plaintiff fails to establish that a defendant caused cruel and usual punishment***

The Eighth Amendment of the United States Constitution prohibits the infliction of cruel and unusual punishment on convicted prisoners.  U.S. CONST. amend. VIII. To demonstrate cruel and unusual punishment, a plaintiff must establish that the defendants acted with "deliberate indifference" and he experienced an extreme deprivation of a basic human need or "serious or significant" pain or injury.  *Wilson v. Seiter*, 501 U.S. 294, 299-303 (1991).

---

[4] Plaintiff's medical record places his weight at 155 pounds as of May 2008.

*1.     Inadequate nutrition can be a deprivation of a basic human need*

Food that provides sufficient nutritional sustenance is, of course, a basic human need. *See*, *e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (stating that adequate food, shelter, clothing, and medical care are the "essentials" that a State must provide prisoners); *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (quoting *Ramos v. Lamm,* 639 F.3d 559, 571 (10th Cir. 1980)) ("It is well-established that inmates must be provided nutritionally adequate food, 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"). Inmates are not entitled to be served particular foods so long as the diets they receive are nutritionally adequate.

Escalante fails to state a claim when complaining about the variety of foods he receives or their subjective qualities like taste, texture or appearance. Escalante acknowledged in his grievances and pleadings that he received in 2008 a variety of wheat-product alternatives, including grits, peanut butter, potatoes, beans, rice, cheese and beans. Starting around April 2009, however, he complained that he received only the same wheat substitutions most of the time – white rice, beans, oatmeal and potatoes. Mere dissatisfaction with the variety, portion size or savor of his prison diet is not sufficient to state a claim. *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (stating foreign objects or cold and unpleasant food is insufficient to state an Eighth Amendment claim). Accordingly, Escalante fails to state a claim about the subjective quality of the food he receives or the variety of his substitutions.

However, Escalante is not just complaining about the foods' subjective qualities

or a short-term interruption in the foods' nutrition. The administrative record reflects his dissatisfaction about the nutritional adequacy of his diet since his arrival at WRSP. Despite eating his approved wheat-free trays, "safer" foods from nonapproved trays and his commissary purchases, Escalante lost 34 pounds between December 2007[5] and December 2008 and became dizzy when exercising.[6] Relying on the instant record viewed in his favor, Escalante's claims of longer-term weight loss combined with dizzy spells are sufficient to state an Eighth Amendment claim. *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (suggesting that to state Eighth Amendment claim inmate must allege "he lost weight or suffered other adverse physical effects or was denied a nutritionally and calorically adequate diet"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (prisoner stated a cause of action under the Eighth Amendment by claiming a rancid, nutritionally deficient diet); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (holding that prisoners have the right to nutritionally adequate food); *Rust v. Grammer*, 858 F.2d 411, 414 (8th Cir. 1988) (diet without fruits and vegetables might violate Eighth Amendment if it were regular prison diet); *Shepard v. Alvarez*, 2009 U.S. Dist. LEXIS 59932, (S.D. Fla. May 20, 2009) (genuine issues of material fact regarding whether and to what extent food served varied from the prescribed menu, nature of food service director's control over and involvement in the content of

---

[5] While the statute of limitations bars plaintiff's recovery for weight loss between December 2007 and May 2008, the overall trend of his weight at WRSP is both probative and relevant to his claim of an inadequately nutritious diet.

[6] A portion of the weight loss may be attributable to Escalante's admission of avoiding some foods, like the allegedly stale, overcooked, rubber-like and inedible rice and the beans that upset his stomach. However, plaintiff argues that the beans cannot be a nutritional substitute when his body cannot process them in the quantities he is required to eat. Furthermore, it is not presently clear how often he would not eat his rice or beans, and the court is required to presently resolve such ambiguities in plaintiff's favor.

food served, regarding whether the food that was served was adequate in calories and nutrition, and whether the food served cause the inmate to lose 40 to 50 pounds over a 16-month period); *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (finding deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward*, 450 F. Supp. 591, 596-97 (W.D.N.Y. 1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights). *But see Martin v. Arpaio*, 2006 U.S. Dist. LEXIS 83330, *10 (D. Ariz. Nov. 14, 2006) (holding that cramping, diarrhea and vomiting are *de minimis* injuries).

### 2. *Plaintiff fails to establish a defendant's deliberate indifference*

In order to show deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Miltier*, 896 F.2d at 851-52.

*a.     Defendant Watson*

The record does not establish Watson's deliberate indifference within the statute of limitations period. In his February 2008 regular grievance to Watson about the lack of food he receives, Escalante said, "I feel like I'm being punished for not being able to eat wheat products.  I'm spending 20 to 30 dollars a week on commissary and I'm still losing weight. I don't think I should rely on my commissary to survive. I just want to receive my proper meals (8 oz.)."  (Encl. B to Ravizee Affidavit at 2.)  In his February 2008 response, Watson interpreted the grievance as a complaint that Escalante was not receiving a nonwheat tray although Escalante specifically wrote, "[Food Service] [is] not denying me a no-wheat tray, but they usually don't give me nothing in place of it." Watson also interpreted the grievance as a complaint that Escalante receives beans when a wheat product is the main course. Watson ultimately determined the grievance as unfounded after concluding that there was no evidence found to support his allegations about improper portions.

Watson also answered Escalante's December 2009 Request for Information. In this request, Escalante attached a request he sent to Scarberry,[7] from whom he allegedly never received a response. Watson replied, noting that he and other staff had repeatedly addressed this topic, Food Service staff was not giving him improper foods, and the nonwheat substitutions he received were appropriate.

Although Escalante describes in his Amended Complaint that he lost 34 pounds over 13 months, Escalante failed to describe in either grievance to Watson the extent of

----

[7]Although his Request for Information is in the record, the attachment is not.

his weight loss. The only information Escalante gave Watson is that he is "still losing weight" which, by itself, is not a sufficient allegation to put Watson on notice that Escalante faced a substantial risk of serious harm by the alleged lack of adequate nutrition. Furthermore, Escalante's February 2008 grievance and Watson's response, even if it provided enough notice to constitute accrual of the action, fall beyond the statute of limitations. Nothing in the December 2009 grievance notified Watson of any risk of harm but merely reiterated his dissatisfaction with the food variety he receives. Accordingly, Escalante fails to establish Watson's deliberate indifference.

      *b.*    *Defendant Huffman*

The record does not establish Huffman's deliberate indifference within the statute of limitations period. Escalante appealed Watson's February 2008 determination to Huffman, the Regional Director. On the part of the form explaining the reason for the appeal, Escalante hypothesized what would happen if staff just stopped feeding him and that he was starving. Escalante also sent Huffman a letter, which his office received in March 2008, asking him to require Food Service to give him more to eat. After reviewing the original complaint, Watson's response and the appeal, Huffman believed Escalante received appropriate substitutions and denied his appeal in April 2008, which forms the sole basis of Escalante's claim against Huffman. However, as already discussed, claims arising before May 2008 are now barred by the statute of limitations. Furthermore, neither the letter to Huffman nor the grievance to Watson and his response apprised Huffman of a substantial risk of serious harm. Therefore, Escalante fails to show any deliberate indifference by Huffman in his Level II response.

c.     *Defendant Harvey*

The record does not establish Harvey's deliberate indifference within the statute of limitations period. Harvey, the former Assistant Warden, responded to five of Escalante's Requests for Information.[8] In his first request made in April 2008, Escalante claimed to have lost 20 pounds and be in poorer health. Harvey responded in the same month and advised Escalante to contact the WRSP nurse to discuss his medically prescribed diet. A year later in April 2009, Escalante asked for a meeting with Harvey and Scarberry about creating a diet specific to his needs. Harvey noted in his response that he spoke with Scarberry about the matter.

Escalante's first request describing the lost 20 pounds made Harvey personally aware of facts implicating a deprivation of adequate nutrition due to Food Service substitutions for his Celiac's disease. However, Harvey was not indifferent to Escalante's health; he directed Escalante to seek medical attention to determine what may be ailing him because Harvey is not a medical professional. Furthermore, both of Escalante's Requests for Information and Harvey's responses occurred more than two years before Escalante filed the instant action, and claims arising from those discussions are barred by the statute of limitations. Therefore, Harvey did not exhibit deliberate indifference, even though the matter falls outside the statute of limitations period, because he directed Escalante to see a medical professional about his concerns.

Escalante did not inform Harvey via his subsequent grievances or Requests for

_____

[8] Three of the requests concerned Escalante's requests for a copy of the menu, to which Harvey advised Escalante to speak with staff.

Information that his weight was still decreasing because of inadequate nutrition. Instead, Escalante reiterated his dissatisfaction with the substitutes he received. Accordingly, the subsequent grievance did not inform Harvey of any further risk of harm, and Escalante fails to establish Harvey's deliberate indifference.

### d. Defendant Scarberry

The record does not establish Scarberry's deliberate indifference. Scarberry responded in April 2008 to Escalante's Request for Information, in which he complained he receives too many beans and instead wanted double portions of meat. Scarberry told him that he cannot receive double portions of meat and that beans, cheese, or peanut butter are the correct nonwheat substitutes. Escalante did not discuss his weight loss.

Harvey sent Scarberry a copy of Escalante's April 2009 Request for Information, by which Escalante wanted to meet with Harvey to discuss alternatives to the wheat-substitute foods he received. However, this grievance also did not discuss his weight loss.

Absent any discussion about his weight loss, Escalante fails to establish that Scarberry was personally aware of any risk of serious harm. Scarberry notes that she is not a doctor and does not make decisions about a medical diet prescribed by a doctor and the VDOC dietician. Instead, Scarberry is responsible for ensuring that offenders who receive a medically prescribed diet receive meals consistent with the ordered diet. (Scarberry Affidavit at ¶ 4.) Scarberry prepared meals with nonwheat substitutes, which conformed to VDOC guidelines and the recommendations by the VDOH

dietician and the DHHS. Scarberry is not authorized to substitute her own judgments for that of Escalante's doctor or the VDOC dietician, neither of these parties directed Scarberry to modify Escalante's diet, and Scarberry did not deviate from the medical diet or VDOC policy despite Escalante's requests. Accordingly, Escalante fails to establish Scarberry's deliberate indifference.

C.     *The defendants are entitled to certain immunities*

1.     *Official Capacity Immunity*

Defendants argue that they are immune from damages in their official capacities. Neither a state nor its officials acting in their official capacities are persons for purposes of § 1983 damages actions. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 n.10 (1989). Therefore, each defendant is immune to the extent that Escalante is suing a defendant in an official capacity for damages.

2.     *Qualified Immunity*

Defendants also argue that they should receive summary judgment on the basis of qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (modified by *Pearson v. Callahan*, 555 U.S. 223

(2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)).

Qualified immunity is an immunity from suit rather than a mere defense to liability. A plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. *See Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993). However, a defendant must demonstrate that the right was not clearly established at the time of the incident to receive qualified immunity. *See Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990). *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

As discussed *supra*, Escalante fails to establish a defendant's deliberate indifference within the statute of limitations. Thus, he failed to carry his burden to demonstrate that a defendant's conduct violated his Eighth Amendment right. Accordingly, the defendants are entitled to qualified immunity in their individual capacities.

III.

For the foregoing reasons, Escalante fails to establish a defendant's deliberate indifference within the statute of limitations, the defendants are entitled to sovereign

immunity from damages in their official capacities, and the defendants are entitled to qualified immunity in their individual capacities. Accordingly, the undersigned recommends that the court **GRANT** the defendants' motion for summary judgment.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Virginia's two-year statute of limitations for personal injury claims is applicable to § 1983 actions;

2. A § 1983 action accrues when a plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action;

3. Escalante filed this action on May 18, 2010;

4. Thus, any claims based on events that accrued prior to May 18, 2008, are time-barred unless the limitations period is tolled;

5. The court's grant of Escalante's "motion for delayed" did not toll the statute of limitations period;

6. Despite Escalante's claim that he mistakenly believed the appropriate statute of limitations period to be three years based upon outdated information contained in WRSP's law library, Virginia law does not toll the statute of limitations period here because Escalante has not shown that any of the defendants had any relationship to the alleged misinformation;

7. Escalante did not need to know the full extent of his injuries in order to file the instant action;

8. Escalante admitted that he knew of the alleged inadequate nutrition upon arrival at WRPS in December 2007 and that he had lost 11 pounds in the first three months at WRSP;

9. Therefore, Escalante experienced a basis for his cause of action more than two years before he filed the action on May 18, 2010;

10. Equitable tolling is not appropriate where a claimant has failed to exercise due diligence in preserving his legal rights;

11. Escalante's decision to wait to file his Complaint until May 2010 when he knew of it by December 2007 does not show due diligence;

12. Thus, equitable tolling does not apply;

13. Therefore, Escalante's claims that accrued before May 18, 2008, are time-barred, and summary judgment is appropriate on such claims;

14. To show an Eighth Amendment violation, Escalante must establish that the defendants were deliberately indifferent and that he experienced an extreme deprivation of a basic human need or serious or significant pain or injury;

15. Escalante's claim of long-term weight loss combined with dizzy spells resulting from allegedly inadequate nutrition are sufficient to show the deprivation of a basic human need or serious or significant injury;

16. However, Escalante has failed to establish deliberate indifference by any of the defendants at any time within the statute of limitations period;

17. Therefore, Escalante fails to establish a violation of the Eighth Amendment by any of the defendants, and summary judgment should be granted in favor of the defendants thereon;

18. To the extent that the defendants are being sued in their official capacities for damages, they are immune from suit, and summary judgment is appropriate as to the claims against the defendants for money damages in their official capacities; and

19. As Escalante has failed to show that the defendants' conduct was, in any way, unlawful, the defendants are entitled to qualified immunity from suit in their individual capacities, and summary judgment is appropriate as to the claims against the defendants in their individual capacities.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 26th day of July 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE